(No. 26716.— )

CHICAGO & WEST TOWNS RAILWAYS, INC., Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(ANNA NALLON, Defendant in Error.)

*Opinion filed November 17, 1942.*

258

BERTHOLD L. GOLDBERG, (IRWIN S. BASKES, of counsel,) for plaintiff in error.

KELLY & COHLER, for defendant in error.

Mr. JUSTICE SMITH delivered the opinion of the court:

This case is here on writ of error granted by this court to review the judgment of the circuit court of Cook county. Upon a hearing the arbitrator made an award in favor of defendant in error and against plaintiff in error, in the sum of $16.50 per week for a period of 242 weeks, and $7.00 for one week. On appeal to the Industrial Commission, the award was sustained. The circuit court of Cook county, on *certiorari*, confirmed the decision of the commission.

The sole question presented here is whether, as a matter of law, the evidence is sufficient to sustain the award. It is contended by plaintiff in error that the facts are not in controversy, and that the question of the sufficiency of the evidence to sustain the award is purely a question of

law. This contention, however, is disputed by defendant in error. She contends that the award of the commission is based on the disputed question of fact as to whether the deceased, at the time he was injured, was engaged in an activity which was incidental to his employment; that the decision of this question necessitated the determination by the commission of the weight of the evidence and, consequently, that the issue before the court is whether the decision of the commission is against the manifest weight of the evidence. An examination of the record discloses that the contention of plaintiff in error that the facts are not in controversy is based upon plaintiff in error's construction of the facts shown by the evidence.

The rule is well settled that where the facts are not in controversy, the question presented is one of law as to whether the uncontroverted facts are sufficient to support the award. (*Farley* v. *Industrial Com.* 378 Ill. 234; *Northwestern Yeast Co.* v. *Industrial Com.* id. 195.) The rule is equally well settled that where the factual situation is such as to require a consideration of the weight of the evidence or the construction to be placed upon it, this is a question of fact. In such cases, the issue presented is whether the decision of the commission is against the manifest weight of the evidence. Primarily this is a question of fact, and only becomes a question of law when there is no dispute as to the facts and when the case is to be determined upon direct evidence and not upon the weight and probative force of circumstantial evidence. It has been repeatedly held that circumstantial evidence in cases of this kind, is legitimate and proper. *Banner Tailoring Co.* v. *Industrial Com.* 354 Ill. 513; *Vulcan Detinning Co.* v. *Industrial Com.* 295 id. 141; *Sparks Milling Co.* v. *Industrial Com.* 293 id. 350; *Northwestern Yeast Co.* v. *Industrial Com. supra.*

There is substantial agreement by counsel that the decisive question is whether the accident, which resulted in the death of the deceased, was one arising out of and in

the course of his employment by plaintiff in error. This issue makes it necessary to set out at some length the facts shown by the evidence.

It is admitted in the record that the deceased was employed by plaintiff in error; that they were both operating under, and subject to, the provisions of the Workmen's Compensation Act; that the deceased, on February 20, 1940, sustained an accidental injury which resulted in his death. The disputed question is whether that accident arose out of and in the course of his employment.

Plaintiff in error is a public utility operationg street-cars and motorbusses in and through certain municipalities located west of the city of Chicago. On the day of the accident, and for some years prior thereto, the deceased was employed as a conductor on what is known as the La Grange line. On that day, his day's work commenced at 3:16 P. M. His run was known as run No. 10, which is designated in the record as a "swing run." He relieved another conductor at that time and took over the car at the northeast corner of the intersection of Harlem avenue and Twenty-second street. At that point, he boarded a westbound car, which was already in operation, for the purpose of relieving another conductor. At 6:15 P. M. he was relieved from actual work until 7:20 P. M. This relief period evidently was for the purpose of enabling him to obtain his lunch. During the relief period, he was not subject to the orders of his employer and rendered no services to the company. During this period he was supposed to eat his lunch and be prepared to take his next car, at the same point, at 7:20 P. M.

Immediately west of Harlem avenue and north of Twenty-second street, was located plaintiff in error's power-house or substation. To the north of the powerhouse or substation, was some vacant ground. Near the south side of this vacant space, a streetcar track enters from Harlem avenue, from a northeasterly direction, running practically

along the north side of the powerhouse. At a point slightly north of the center of this vacant ground, a car track also entered from Harlem avenue, from the southeast. From that part of this track, located on the property of plaintiff in error north of the powerhouse, eight streetcar tracks branched off extending practically due north into the carbarn of plaintiff in error. Cars were kept in the carbarn when not in use. All cars started their runs from the carbarn to which they were returned at the end of the day. The premises of plaintiff in error, beginning with the powerhouse at the northwest corner of the intersection of Harlem avenue with Twenty-second street, extended north between 600 and 700 feet, with the carbarn at the extreme north. The carbarn was a large building. Extending from the northeast corner of the powerhouse to the southeast corner of the carbarn, along the east side of plaintiff in error's property, was a high board fence. There were three openings in this board fence, two where the streetcar tracks entered, each about 20 to 30 feet in width. These openings were used to enable the streetcars to get into the property and carbarn of plaintiff in error. At the north end of the fence, and immediately south of the carbarn, there was a third opening which was some five or six feet in width. Just inside this opening in the fence was located a door entering the carbarn from the south. This was the employees' entrance. The east line of plaintiff in error's property on which the fence was located, and the east line of the powerhouse and carbarn was about three feet west of the west curb line of the pavement on Harlem avenue. The vacant space between the curb line of the street and the fence and buildings along the east side of plaintiff in error's property, was occupied to some extent by large poles carrying wires and some other obstructions. The carbarn, in addition to housing the cars, contained a rest room for employees, in which seats were provided, a table on which they were permitted to, and frequently did, eat

their lunches, and toilet facilities. These were provided for the convenience of employees. There was also located in this room a cage or room occupied by the cashier. A cashier was on duty 24 hours each day. At the end of their day's work, the conductors were required to turn in their reports and cash to this cashier. They also had occasion to go to the cashier's office frequently during their day's work for the purpose of providing themselves with change. An official bulletin was maintained in this rest room on which orders to the employees were posted. This bulletin was the means of communication between the management and the operating employees. If by reason of obstructions on the tracks, or other causes, a car could not make its regular run, this fact was posted on the bulletin with other orders and instructions to the employees operating the cars. The room was provided and generally maintained for. the use of the employees. The cashier's office in the carbarn was the only place provided where conductors could obtain change, and it was maintained largely for that purpose. They also made reports to the cashier in connection with their work. The conductors were required to provide themselves with change before they started on their runs.

Harlem avenue is a much-traveled street. It was paved and had three southbound traffic lanes on the west side. An employee leaving a car at the northeast corner of the intersection of Harlem avenue and Twenty-second street, in order to get to the carbarn, would either cross Harlem avenue on the north side of Twenty-second street and then walk in the street along the west side of Harlem to the gate immediately south of the carbarn, or he could walk on the sidewalk on the east side of Harlem avenue to some point farther north and then cross the street to the gate or opening in the fence near the door of the carbarn just inside the gate. There was no other route by which he could

reach the carbarn from Twenty-second street and Harlem avenue. Employees were given no instructions as to where they should cross Harlem avenue or as to what route they should use. The evidence shows that the route usually traveled by employees leaving the cars at the northeast corner of the intersection of Harlem avenue and Twenty-second street, was to cross Harlem at any point between Twenty-second street and the gate. They would then enter the gate and from thence go through the door into the carbarn. Because of the volume of traffic on Harlem either crossing or walking in the street between Twenty-second street and the carbarn, was necessarily dangerous. There was no crossing between Twenty-second street and the gate. Persons crossing the street there were required to cross in traffic between two intersections. If they walked up the west side of Harlem avenue from Twenty-second street there was no walk. There was only the narrow space unpaved, between the west curb of Harlem avenue and the fence of plaintiff in error. This space was largely occupied by poles some 14 inches in diameter and other obstructions. Because of this condition, it was difficult to walk along the west side of Harlem avenue at that point without walking in the street. The proof shows that at the time in question there was considerable snow along the west side of Harlem avenue and on the strip of ground between the west curb and the fence. Snow had fallen during the day; the snow plows had pushed it off to the side of the pavement. During the day the snow was soft, but when night came on it was frozen. The proof shows that this frozen snow and ice completely covered the space west of the curb and extended out on the pavement for some distance east of the curb, at some points. It extended so far out on the pavement that it was necessary for southbound cars to use the center southbound traffic lane, the west lane being obstructed by the snow and ice. There

was a sidewalk on the east side of Harlem avenue, extending from Twenty-second street north beyond a point opposite the carbarn.

The deceased was relieved from duty on his car at Twenty-second street and Harlem at 6:15 P. M. on the day in question. This was a westbound car. He then caught an eastbound car at Harlem avenue and rode over to Oak Park avenue where he obtained his lunch. His next duties were to catch a westbound car at Twenty-second and Harlem, at 7:20 P. M. He reached Twenty-second and Harlem shortly before seven o'clock. At about 6:55 P. M. he was struck by an automobile, being driven south on Harlem avenue. At the time of the accident the car which struck him was being driven in the center southbound traffic lane some nine feet east of the west curb at a point about 150 feet north of Twenty-second street. Immediately after the accident the body was found lying two and a half to three feet from the fence along the west line of Harlem avenue. He had his money-changer on. He died shortly thereafter. At the time he was struck, it is clear he was either crossing Harlem avenue or walking north along the west side of the street. The motorman on the car which deceased rode from Oak Park to Harlem avenue and Twenty-second street, and which he left at that point, testified that when he got off the car he started to walk north on the sidewalk on the east side of Harlem; that the last time he observed him he was 12 to 14 feet north of the north curb of Twenty-second street.

At the time of the accident, deceased was headed toward the carbarn in which the rest room, toilets and cashier's cage were located. If he was on his way to the carbarn for the purpose of obtaining change from the cashier, examining the bulletin board, the use of the toilets or other facilities, his trip was incident to his employment, even though he was not actually to begin work again until some 20 minutes later.

There is a dispute in the record as to whether his employment ceased during the lunch hour. The testimony offered by plaintiff in error tends to show that the deceased was relieved from his employment during that time and had no duties whatever to perform. There is evidence in the record, however, which tends to show that it was his duty, before the time to start his next run, to provide himself with change, attend to his personal wants which were incident to his employment, to examine the bulletin board for orders and instructions as to the further performance of his duties. There is also evidence in the record which tends to controvert the contention of plaintiff in error that his work absolutely ceased during the lunch hour and that he was not in the employ of plaintiff in error during that hour. After his body was taken to the hospital, there was found in his pockets petitioner's exhibit 3, which is identified in the record as a trip sheet. This trip sheet contained information with reference to the car he should operate, the time of leaving and arriving at given points, the number of passengers carried during the time he worked, and other information. Among other things the trip sheet showed that he was to go on duty at 3:16 P. M. and off at 12:14 A. M.; that the total time of his day's employment was eight hours and four minutes. There is also testimony in the record tending to show that at least some of the information he had placed on the trip sheet himself was obtained by him from the bulletin board in the car barn; that it was the deceased's custom, in his employment, when he returned from his lunch, to get off a westbound car at the northeast corner of the intersection at Twenty-second and Harlem; that he would sometimes cross Harlem avenue a short distance north of Twenty-second street and walk up the west side of Harlem avenue along the fence to the opening at the south end of the carbarn, where he would enter the carbarn through the door near this opening in the fence. The evidence in the record justifies

the conclusion that he was returning to the carbarn by this route at the time of the accident. It was further shown that it was his custom when he returned from his lunch, as early as 7:00 P. M., and got off the car at Harlem and Twenty-second street, to go to the carbarn before taking his next run at 7:20.

It is obvious from the foregoing statement of facts that if he was on his way to the carbarn for the purpose of obtaining change, examining the bulletin board, or any other purpose in connection with his employment, he was at a point where his duties took him. This being true, the accidental injury was sustained in the course of his employment. It is equally obvious that if he was traveling the usual and most direct route to the carbarn, and in using that route was required to cross Harlem avenue, which was a place of danger because of the traffic on that street, this was a risk and danger incident to his employment. It was not one to which the public generally was exposed. It was a risk and danger arising out of his employment, within the statute.

There being a dispute in the evidence as to whether his employment continued during the lunch hour, or whether it was continuous from 3:16 P. M. until 12:14 A. M., and there being evidence tending to show circumstances strongly indicating that he was on his way to the carbarn in connection with his employment, it cannot be said as a matter of law, that the accident did not arise out of and in the course of his employment. In this state of the record, we cannot say that the decision of the commission is manfestly against the weight of the evidence. These were questions of fact and the decision of the commission is final.

The trial court did not err in entering the judgment confirming the award of the commission, and that judgment is affirmed. *Judgment affirmed.*